**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Eric Brian Pearce, | CV 06-2841-PHX-SMM (JR) |
| Petitioner, | |
| vs. | **REPORT AND** |
| Charles L. Ryan, et al., | **RECOMMENDATION** |
| Respondents. | |

Pending before the Court are Petitioner Eric Brian Pearce's First Amended Petition for Writ of Habeas Corpus (Doc. 15) and Supplemental Memorandum to Petition for Writ of Habeas Corpus (Doc. 100) filed pursuant to 28 U.S.C. § 2254. In accordance with the Rules of Practice of the United States District Court for the District of Arizona and 28 U.S.C. § 636(b)(1), this matter was referred to the

Magistrate Judge for report and recommendation.[1]   As explained below, the Magistrate Judge recommends that the District Court, after an independent review of the record, dismiss the Petition with prejudice.

Also pending are Pearce's Motion to Expand Record with Exhibits (Doc. 112) and Motion to Exceed Page Limitations (Doc. 113), both of which are granted.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

On the evening of January 17, 2000, 19-year old Christopher Vega and 15-year old Christopher Duran were picked up at Vega's house by two men driving a primer colored 1970s model Chevrolet Monte Carlo.  *Answer*, Ex. DD, p. 130; Ex. FF, p. 57-58.  Vega introduced the driver to Duran, identifying him as "Eric."  *Id*., Ex. DD, p. 134.  Vega and Duran got into the back seat of the car and the four men drove to nearby Conocido Park.  *Id*., pp. 136-137.  Arriving at the park a little after sunset, the four parked the car and proceeded to a picnic table.  *Id.*, pp. 140-41.  The group smoked marijuana from a pipe provided by Eric's friend.  *Id*., p. 144.  Two or three minutes later, Eric got up and put his foot on the picnic table's bench and pulled

_____

[1] This case was stayed until October 2011 while Pearce returned to state court to exhaust new claims.  Shortly after the stay was lifted, Pearce's then counsel filed a Second Amended Petition (Doc 82).  Then, acting in pro per, Pearce sought to have the Second Amended Petition stricken from the record and also sought to represent himself.  Pearce's requests were granted on September 12, 2012, and he began representing himself at that time (Doc. 94).   Pearce then filed his own Supplemental Memorandum, which was fully briefed in April 2013 (Doc. 114).  Along with the Supplemental Memorandum, Pearce filed a Motion to Expand Record (Doc. 112) which was fully briefed on May 15, 2013.  The claims raised in the First Amended Petition, the Supplemental Memorandum and the Motion to Expand Record are all addressed in this Report and Recommendation.

1  a gun and pointed it in the direction of Vega.  *Id.*, pp. 144-45.  Vega and Duran

2  turned to run and Eric began to fire the gun.  *Id.*, pp. 145-46.  Vega was shot seven

3  times and died from his wounds.  *Id.*, Ex. FF, p. 58. Duran was struck at least four

4  times, with injuries to his right hand, right and left thighs, and his left shin.  *Id.*, Ex.

5  DD, p. 151.  He was airlifted from the scene and was in the hospital for several days.

6  *Id.*, p. 150.  Duran identified the shooter in a photographic line-up and at trial as

7  Petitioner Eric Pearce.  *Id.*, pp. 147, 154-57.

8  Pearce was arrested for killing Vega and shooting Duran and indicted on

9  charges of first-degree murder and attempted first-degree murder.  *Answer*, Ex. A.

10  After a jury trial, Pearce was convicted on both counts.  *Id.*, Ex. B.  On April 13,

11  2001, Pearce was sentenced to a term of natural life in prison on the first-degree

12  murder conviction, and to a consecutive 21-year term on the attempted first-degree

13  murder conviction.  *Id.*, Ex. C.

14  **A.    Direct Appeal**

15  Pearce timely appealed and raised the following three claims:

16  1.    The trial court abused its discretion by denying Pearce's request
    for a "lost evidence" instruction pursuant to *State v. Willits*, 96 Ariz.
17  184, 393 P.2d 274 (1964), based on Detective Ernest Moreno's
    destruction of his notes reflecting Duran's description of the shooter
18  and the failure to incorporate the description in his police report.

19  2.    Arizona's first-degree murder statute eliminated the requirement
    of "actual reflection" as a requirement to prove premeditation, in
20  violation of the due process requirements of the Fifth and Fourteenth
    Amendments.

21

22

3

3.      The trial court, in violation of the due process requirements of the Fifth and Fourteenth Amendments, failed to conduct a sentencing hearing as mandated by A.R.S. § 13-703.

*Answer*, Ex. D.  The state filed a brief in opposition.  *Id*., Ex. E.  In a Memorandum Decision filed on August 13, 2002, the Arizona Court of Appeals affirmed Pearce's convictions and sentences.  *Id*., Ex. F.  Pearce then petitioned the Arizona Supreme Court for review, this time raising only claims 1 and 2.  *Id*, Ex. G.   The Arizona Supreme Court denied review by order dated January 9, 2003.  *Id*., Ex. H.

**B.      First Post-Conviction Relief Proceeding**

On February 13, 2003, Pearce filed a *pro se* Notice of Post-Conviction Relief (PCR) in the trial court.  *Id*., Ex. I.  On April 9, 2003, Pearce filed his Petition for Post-Conviction Relief wherein he raised the following claims:

1.      The State's actions violated Pearce's due process rights and amounted to prosecutorial misconduct which prejudiced the defendant and resulted in an unfair trial based on the violation of Rules 15.1 and 28 of the Arizona Rules of Criminal Procedure.  The alleged violations resulted from Detective Moreno's destruction of the interview notes reflecting Duran's description of the shooter and his failure to incorporate the description into the police report.

2.      Pearce's counsel rendered ineffective assistance in violation of *Strickland v. Washington*, 466 U.S. 668 (1984), by:

a.      failing to call witnesses to testify about the color of Pearce's Monte Carlo;

b.      failing to withdraw as counsel;

c.      failing to file a motion for disclosure of exculpatory evidence pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963);

d.     failing to request a "lost evidence" instruction based on Detective Moreno's failure to maintain his notes of Duran's description of the shooter;

e.     failing to notify Pearce of a plea offer the existence of which Pearce learned the day before the plea deadline;

f.     failing to request a live line-up due to the suggestive nature of the photo line-up;

g.     failing to call witness Michael Steven Perrin to establish that Pearce had been misidentified as the shooter named "Eric;"

h.     failing to call Vega's cousin, Steven Daniel Anchondo, Jr., who knew of another "Eric" who was looking for individuals who had "ripped him off;"

i.     failing to call witness Christopher Tinsley who would have testified that he and Pearce drove Pearce's Monte Carlo to Las Vegas for New Years and that the car was dark blue in color at the time;

j.     failing to have investigator Joe Otero sit at the defense table during trial to assist with strategy and cross-examination;

k.     failing to request that Pearce be allowed to sit other than at the defense table during the examination of Duran so that he would not be readily identified because he was sitting at the defense table;

l.     refusing to allow Pearce to testify on his own behalf because he wrongly believed he was subject to impeachment based on his juvenile record;

m.     failing to adequately cross-examine Duran based on misidentification, character and gang-affiliation;

n.     failing to present expert testimony regarding the effects of cocaine and marijuana use on memory and perception;

o.     failing to adequately argue reasonable doubt during closing arguments;

5

p.     failing to request a jury instructions that witness Daniel McCurdy's testimony should be viewed with suspicion due to his involvement in the crime; that the jury before being satisfied of guilt beyond a reasonable doubt, be satisfied that the in-court identification was independent of the pre-trial identification;

q.     failing to request a jury instruction for lesser included offense;

*Id.*, Ex. K.  The State filed a response.  *Id.*, Ex. L.  In a Minute Entry ruling filed November 6, 2003, the trial court summarily dismissed the petition.  *Id.*, Ex. M.  The trial court found that Pearce's claim of prosecutorial misconduct was precluded because "it either could have been or was raised on appeal."  *Id.*, p. 1.  The trial court then addressed Pearce's claims of ineffective assistance and found that none of the claims were colorable.  *Id.*, p. 1-2.

Pearce then sought review of his post-conviction petition in the Arizona Court of Appeals.  *Id.*, Ex. N.  He raised the following claims in the petition:

1.     The pre-trial photographic line-up was unduly suggestive in violation of due process.

2.     Pearce's counsel rendered ineffective assistance in violation of *Strickland v. Washington*, 466 U.S. 668 (1984), by:

a.     failing to call Perrin and Anchondo as witnesses to prove misidentification;

b.     misstating that Pearce could be impeached with his juvenile adjudications if he testified at trial;

c.     failing to notify Pearce of a plea offer.

*Id.*, pp. 4-7.  By Order filed July 7, 2005, the Court of Appeals denied review without comment.  *Id.*, Ex. P.

6

While his petition for review was pending in the Court of Appeals, Pearce sought to amend or supplement the petition to include a claim pursuant to *Blakely v. Washington*, 542 U.S. 296 (2004). *Id*, Ex. O. The Court of Appeals denied the request, noting that the mandate issued on February 11, 2003, and finding that *Blakely* was not retroactive. *Id.* Pearce then moved to stay the appeal in order to "raise further issues in the Superior Court . . . ." *Id.* He also sought leave to amend the petition. *Id.* The Arizona Court of Appeals denied both requests. *Id.*

Pearce then sought review by the Arizona Supreme Court, raising the following claims:

1. The State never proved that his "destroyed evidence" claim was preluded under Rule 32.2(c), Ariz.R.Crim.P.

2. His appellate counsel rendered ineffective assistance by filing to raise on direct appeal his claims of prosecutorial misconduct, destruction of evidence and suggestive identification procedures.

3. The State destroyed evidence by not incorporating the surviving victim's description of the shooter into the police report.

4. The trial court violated Pearce's right to due process ruling the pre-trial line-up procedures were not unduly suggestive.

5. The trial court violated Pearce's due process rights by instructing the jury not to infer guilt from Pearce's decision not to testify.

6. Trial counsel was ineffective for failing to:

   a. adequately cross-examine the surviving victim;

   b. call witnesses Michael Perrin, Steven Anchondo, and Chris Tinsley;

c.      submit to the trial court Pearce's request that he be withdrawn as counsel;

d.      request sanctions be imposed against the State based on the destruction of evidence;

e.      properly challenge the pretrial photo line-up;

f.      notify Pearce of the State's plea offer;

g.      request a live line-up prior to trial;

h.      request other seating for Pearce during the testimony of the surviving victim;

i.      allow Pearce to testify at trial;

j.      properly examine witness McMurdy regarding his testimony about Pearce's request to have his car painted;

k.      to call an expert witness regarding the effects of time, stress and drug use on memory;

l.      present an adequate closing argument;

m.      request jury instructions regarding the suggestive pre-trial line-up and misidentification.

7.      The Arizona Court of Appeals misapplied Arizona law in denying Pearce's request to amend his petition for review.

*Answer*, Ex. Q.  On January 23, 2006, the Arizona Supreme Court denied review without comment.  *Id.*, Ex. R.

**C.      Second Post-Conviction Relief Proceeding**

While his first PCR petition was pending, Pearce filed a second *pro se* PCR notice in the trial court on April 19, 2005, raising the following claims:

8

1.      Judicial error in allowing grand jury indictment to stand when it was tainted by the destruction of the surviving victim's identification of his assailant.

2.      Judicial error in allowing misidentification to take place as well as allowing the use of a suggestive line-up.

3.      Sentence not according to A.R.S. § 13-604.

4.      Sentence not according to *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Blakely v. Washington*, 542 U.S. 296 (2004).

5.      Prosecutorial misconduct in presenting a tainted line-up and destroying material evidence.

6.      Ineffective assistance of appellate counsel for not continuing to raise the foregoing issues and for "misadvising" Pearce when to file his Rule 32 petition and leading him to "waive federal review of direct appeal on issues of *Willits* and *Thompson* (first degree murder statute is vague)."

7.      Ineffective assistance of appellate counsel for failing to raise a claim under *Apprendi* and A.R.S. § 13-604(M).

8.      "Evidence insufficient to support cruel and heinous aggravating factor. Court cannot use juvenile record to punish adult offender."

*Answer*, Ex. S.  On May 5, 2005, the trial court ruled that Pearce's PCR notice was untimely; that *Blakely* was not applicable to Pearce's conviction; and that Pearce was not entitled to relief on any of his remaining claims under Rule 32.2(a) "because they either were or should have been raised on direct appeal or in the prior Rule 32 proceeding, which was dismissed on November 4, 2003."  *Id.*, Ex. T.  On January 27, 2006, the Arizona Court of Appeals denied review of Pearce's petition for review without comment.  *Id.*, Ex. V.  On August 17, 2006, the Arizona Supreme Court denied review without comment.  *Id.*, Ex. W.

9

**D.     Original and First Amended Petitions for Writ of Habeas Corpus**

On November 24, 2006, Pearce filed his original petition for writ of habeas corpus, and then was permitted to file an amended petition, which he filed on March 6, 2007.  In the amended petition, Pearce raised the following 10 grounds for relief:

1.     Denial of the right to a jury determination of the factors supporting aggravated sentences and to the effective assistance of trial and appellate counsel regarding that issue.

2.     Ineffective assistance of counsel during pretrial proceedings, including the failure to present Pearce with the plea offer, failure to arrange a pre-trial line-up, failure to investigate and present witnesses for the defense, failure to request sanctions based on the State's alleged destruction of evidence.

3.     Ineffective assistance of counsel for failing to properly advise Pearce about the State's plea offer.

4.     Ineffective assistance of trial counsel based on counsel's failure to call witnesses, including an expert witness on identification.

5.     Ineffective assistance of trial counsel for failing to properly advise Pearce regarding his right to testify on his own behalf.

6.     Ineffective assistance of trial counsel during cross-examination of the surviving victim.

7.     Ineffective assistance of trial counsel for failing to request jury instructions on the reliability to identification.

8.     Ineffective assistance of trial counsel based on the totality of the errors committed before and during trial which resulted in Pearce's conviction and sentence.

9.     Denial of due process resulting from the trial court's failure to instruct the jury on the loss or destruction of evidence.

10.    Denial of due process resulting from vagueness of Arizona's first-degree murder statute.

1   *First Amended Petition* (Doc. 15).

2     **E.**  **Third Post-Conviction Relief Proceeding**

3     In 2008, Pearce filed a third notice of post-conviction relief in state court.

4   *Supplemental Memorandum to Petition for Writ of Habeas Corpus* (Doc. 100), Ex.

5   A.  Pearce avowed that a witness overheard Petitioner's cousin "brag" at a party that

6   he had committed the shooting and Vega's murder, but Pearce "had gone down for

7   it" *Id*., p. 3.  Pearce asserted this new evidence met the requirements of Rule 32.1(e)

8   of the Arizona Rules of Criminal Procedure.  (*Id*.).  On April 3, 2008, the superior

9   court granted Petitioner's request to file a successive petition for post-conviction

10   relief.  *Reply in Support of Supplemental Memorandum* (Doc. 114), Ex. 15.  Pearce

11   then filed his motion to stay this federal habeas proceeding on May 12, 2008 (Doc.

12   51), and filed the state petition on May 30, 2008, *Supplemental Memorandum to*

13   *Petition for Writ of Habeas Corpus* (Doc. 100), Ex. B.  Subsequently, Pearce asserted

14   that a second person came forward alleging that he was at a party where Petitioner's

15   cousin made incriminating statements.  *Supplemental Memorandum to Petition for*

16   *Writ of Habeas Corpus* (Doc. 100), Ex. D.  On June 3, 2009, the trial court issued a

17   Minute Entry denying the third PCR petition.  *Id*., Ex. G.  Pearce sought review of

18   the decision by the Arizona Court of Appeals, *id*., Ex. H, and review was summarily

19   denied by Order dated February 25, 2011, *id.*, Ex. K.  Pearce then petitioned the

20   Arizona Supreme Court, *id*., Ex. L, and review was denied without comment on

21   August 1, 2011, *id*., Ex. M.

22

1

**F.      Stay and Supplemental Memorandum**

2      Based on the pendency of Pearce's third PCR petition, the District Court, on

3  March 30, 2009, stayed this action.  (Doc. 70).  The stay was lifted on October 12,

4  2011.  (Doc. 81).  In November, 2011, through counsel, Pearce filed a Motion to

5  Amend/Correct his habeas petition and lodged a proposed Second Amended Petition

6  for Writ of Habeas Corpus. (Docs. 82 and 83).  Subsequently, acting on his own

7  behalf, Pearce filed a Motion to Strike the Second Amended Petition and Replace

8  with Supplemental Petition.  (Docs. 91 and 92).  The motion was granted and, on

9  January 16, 2013, Pearce filed his Supplemental Memorandum for Writ of Habeas

10  Corpus, which supplemented the ten claims raised in the First Amended Petition and

11  also added an eleventh claim under *Brecht v. Abrahamson*, 507 U.S. 619 (1993), that

12  he did not receive a fair trial and his due process rights were violated.  *Supplemental*

13  *Memorandum*, pp. 3-9.   Respondents filed their response to the Supplemental

14  Memorandum on March 15, 2013.  (Doc. 109).  Pearce filed his Reply on April 22,

15  2013.  (Doc. 114).

16  **II.      LEGAL DISCUSSION**

17      **A.      AEDPA Legal Standard**

18      Under the Anti-terrorism and Effective Death Penalty Act of 1996

19  ("AEDPA"), a federal court "shall not" grant habeas relief with respect to "any claim

20  that was adjudicated on the merits in State court proceedings" unless the state

21  decision was (1) contrary to, or an unreasonable application of, clearly established

22  federal law as determined by the United States Supreme Court; or (2) based on an

1    unreasonable determination of the facts in light of the evidence presented in the State

2    court proceeding.   28 U.S.C. § 2254(d)(1)-(2);   *see Williams v. Taylor*, 120 S.Ct.

3    1495 (2000).

4         A state court's decision can be "contrary to" federal law either (1) if it fails to

5    apply the correct controlling authority, or (2) if it applies the controlling authority to

6    a case involving facts "materially indistinguishable" from those in a controlling case,

7    but nonetheless reaches a different result.  *Van Tran v. Lindsey*, 212 F.3d 1143, 1150

8    (9th Cir. 2000).  In determining whether a state court decision is contrary to federal

9    law, the court must examine the last reasoned decision of a state court and the basis

10   of the state court's judgment.  *Packer v. Hill*, 277 F.3d 1092, 1101 (9th Cir. 2002).

11        A state court's decision can be an unreasonable application of federal law

12   either (1) if it correctly identifies the governing legal principle but applies it to a new

13   set of facts in a way that is objectively unreasonable, or (2) if it extends or fails to

14   extend a clearly established legal principle to a new context in a way that is

15   objectively unreasonable.  *Hernandez v. Small*, 282 F.3d 1132 (9th Cir. 2002).

16        **B.    Exhaustion and Procedural Default**

17        A state prisoner must exhaust the available state remedies before a federal

18   court may consider the merits of his habeas corpus petition.  *See* 28 U.S.C. §

19   2254(b)(1)(A); *Nino v. Galaza,* 183 F.3d 1003, 1004 (9th Cir.1999).  Exhaustion

20   occurs either when a claim has been fairly presented to the highest state court, *Picard*

21   *v. Connor*, 404 U.S. 270, 275 (1971), or by establishing that a claim has been

22

1    procedurally defaulted and that no state remedies remain available, *Reed v. Ross*, 468

2    U.S. 1, 11 (1984).

3       Exhaustion requires that a habeas petitioner present the substance of his

4    claims to the state courts in order to give them a "fair opportunity to act" upon these

5    claims. *See O'Sullivan v. Boerckel,* 526 U.S. 838, 844 (1999). A claim has been

6    "fairly presented" if the Pearce has described the operative facts and legal theories on

7    which the claim is based. *Picard v. Connor*, 404 U.S. 270, 277-78 (1971); *Rice v.*

8    *Wood*, 44 F.3d 1396, 1403 (9th Cir. 1995). The operative facts must be presented in

9    the appropriate context to satisfy the exhaustion requirement. The fair presentation

10    requirement is not satisfied, for example, when a claim is presented in state court in a

11    procedural context in which its merits will not be considered in the absence of special

12    circumstances. *Castille*, 489 U.S. at 351. An exact correlation of the claims in both

13    state and federal court is not required. *Rice,* 44 F.3d at 1403. The substance of the

14    federal claim must have been fairly presented to the state courts. *Chacon v. Wood*,

15    36 F.3d 1459, 1467 (9th Cir. 1994) (citations omitted).

16       A petitioner may also exhaust his claims by either showing that a state court

17    found his claims defaulted on procedural grounds or, if he never presented his claims

18    in any forum, that no state remedies remain available to him. *See Jackson v. Cupp*,

19    693 F.2d 867, 869 (9th Cir. 1982). "To exhaust one's state court remedies in

20    Arizona, a petitioner must first raise the claim in a direct appeal or collaterally attack

21    his conviction in a petition for post-conviction relief pursuant to Rule 32," *Roettgen*

22    *v. Copeland*, 33 F.3d 36, 38 (9th Cir. 1994), and then present his claims to the

1    Arizona Court of Appeals.  *See Swoopes v. Sublett,* 196 F.3d 1008, 1010 (9th Cir.

2    1999).

3        Where a petitioner has failed to fairly present a claim in state court, it may

4    nevertheless be "exhausted", but procedurally defaulted and barred from federal

5    habeas review in a variety of circumstances.  If a state court expressly applied an

6    adequate and independent state procedural bar when the petitioner attempted to raise

7    the claim in state court review of the merits of the claim by a federal habeas court is

8    barred.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991).  Arizona courts have

9    been consistent in the application of the state's procedural default rules.  *Stewart v.*

10   *Smith*, 536 U.S. 856, 860 (2002) (holding that Ariz.R.Crim.P. 32.2(a) is an adequate

11   and independent procedural bar).

12       Additionally, in Arizona, claims not previously presented to the state courts on

13   either direct appeal or collateral review are generally barred from federal review

14   because any attempt to return to state court to present them would be futile unless the

15   claims fit into a narrow range of exceptions.  *See* Ariz.R.Crim.P. 32.1(d)-(h), 32.2(a)

16   (precluding claims not raised on direct appeal or in prior post-conviction relief

17   petitions), 32.4(a) (time bar), 32.9(c) (petition for review must be filed within thirty

18   days of trial court's decision).  Because these rules have been found to be

19   consistently and regularly followed, and because they are independent of federal law,

20   either their specific application to a claim by an Arizona court, or their operation to

21   preclude a return to state court to exhaust a claim, will procedurally bar subsequent

22   review of the merits of such a claim by a federal habeas court.  *Stewart*, 536 U.S. at

860; *Ortiz v. Stewart*, 149 F.3d 923, 931-32 (9th Cir. 1998) (Rule 32, Ariz.R.Crim.P. is strictly followed); *State v. Mata*, 916 P.2d 1035, 1050-52 (Ariz. 1996) (waiver and preclusion rules strictly applied in post-conviction proceedings).

A federal court may not consider the merits of a procedurally defaulted claim unless the petitioner can demonstrate cause for his noncompliance and actual prejudice, or establish that a miscarriage of justice would result from the lack of review. *See Schlup v. Delo*, 513 U.S. 298, 321 (1995). To establish cause, a petitioner must point to some objective factor external to the defense impeded his efforts to comply with the state's procedural rules. *Dretke v. Haley*, 541 U.S. 386, 393-94 (2004). "[C]ause is an external impediment such as government interference or reasonable unavailability of a claims factual basis." *Robinson v. Ignacio*, 360 F.3d 1044, 1052 (9th Cir. 2004) (citations omitted). Ignorance of the state's procedural rules or lack of legal training do not constitute legally cognizable "cause" for a petitioner's failure to fairly present a claim. *Hughes v. Idaho State Board of Corrections*, 800 F.2d 905, 908-10 (9th Cir. 1986); *Schneider v. McDaniel*, 674 F.3d 1144, 1153 (9th Cir. 2012). "Prejudice" is actual harm resulting from the constitutional violation or error. *Magby v. Wawrzaszek*, 741 F.2d 240, 244 (9th Cir. 1984); *Thomas v. Lewis*, 945 F.2d 1119, 1123 (9th Cir. 1996).

Alternatively, a federal court may review the merits of a procedurally defaulted claim where a petitioner can establish that a "fundamental miscarriage of justice" would otherwise result. *Schlup v. Delo*, 513 U.S. at 327. A fundamental

miscarriage of justice exists when a constitutional violation resulted in the conviction of one who is actually innocent.  *Id*.

### C.   Analysis

#### 1.   Ground I

In Ground I of the Amended Petition, Pearce contends that his Sixth and Fourteenth Amendment rights to a jury trial were violated by the trial court's consideration of factors used to enhance/aggravate his sentence.  *Amended Petition*, p. 5.  To support his claim, Pearce relies on *Blakely v. Washington*, 542 U.S. 296 (2004), in which the United States Supreme Court held that pursuant to its decisions in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring v. Arizona*, 536 U.S. 584 (2002), a defendant is entitled to have a jury determine any fact that increases the penalty for a crime.

Pearce first raised this claim on April 19, 2005, in his second PCR petition. *Answer*, Ex. S.  On May 5, 2005, the trial court ruled that the Second PCR was untimely and that *Blakely* did not apply retroactively to Pearce's conviction.  *Answer*, Ex. T.  On January 27, 2006, the Arizona Court of Appeals denied review of Pearce's petition for review without comment.  *Id*., Ex. V.  On August 17, 2006, the Arizona Supreme Court denied review without comment.  *Id*., Ex. W.  The state courts' decisions were correct.

Direct review of Pearce's claims by the state courts terminated on January 9, 2003, when the Arizona Supreme Court denied review of Pearce's direct appeal.  *Id*., Ex. H.  Pearce had 90 days thereafter to file a petition for writ of certiorari in the

1   United States Supreme Court.  U.S.S.Ct.R. 13(1).  As both Pearce and Respondents

2   note, Pearce's conviction became final on April 9, 2003.  *Traverse*, p. 30 n. 139;

3   *Answer*, p. 15.  *Blakely* was decided over a year later, on June 24, 2004, and was

4   determined under *Teague v. Lane*, 489 U.S. 288 (1989), not to apply retroactively to

5   convictions that were final before the decision was announced.  *Schardt v. Payne*,

6   414 F.3d 1025, 1034-36 (9th Cir. 2005); *Cook v. United States*, 386 F.3d 949, 950 (9th

7   Cir. 2004).  Because *Blakely* does not apply retroactively, the trial court's ruling was

8   correct and Pearce's claim is without merit.

9                         **2.      Pearce's IAC Claims**

10              In Grounds II through VIII of the Amended Petition, Pearce alleges his trial

11   counsel was ineffective due to the failure to properly advise Pearce about the State's

12   the plea offer, failure to arrange a pre-trial line-up, failure to investigate and present

13   witnesses for the defense, failure to call an expert witness on identification, failure to

14   request sanctions based on the State's alleged destruction of evidence, failure to

15   properly advise Pearce regarding his right to testify on his own behalf, ineffective

16   cross-examination of the surviving victim, failure to request jury instructions on the

17   reliability to identification.  *Amended Petition*, pp. 6-12; *Supplemental Petition*, pp.

18   2-3, 10-18.  Respondents contend that Pearce is in default on several of his IAC

19   claims because he failed to raise them before the Arizona Court of Appeals in the

20   appeal of the trial court's denial of his PCR petition.  The Court agrees.

21                         **a.      Unexhausted IAC Claims**

22

1       Pearce presented all of his current IAC claims to the trial court in his first PCR

2   petition.  *Answer*, Ex. K.  The trial court denied each of the claims, finding that

3   Pearce had failed to present a colorable claim for ineffective assistance of counsel.

4   *Id*., Ex. M.  Pearce appealed the trial court's ruling, but raised only three claims of

5   ineffective assistance of counsel in his petition to the Arizona Court of Appeals:

6   failure to call Perrin and Anchondo as witnesses to prove misidentification;

7   misstating that Pearce could be impeached with his juvenile adjudications if he

8   testified at trial; failure to notify Pearce of a plea offer.  *Id*., Ex. N.  After the Court of

9   Appeals denied relief, Pearce petitioned the Arizona Supreme Court for review, but

10  raised all of the claims raised in the trial court and not just the three that he had

11  included in his petition filed in the court of appeals.  *Id*., Ex. Q.

12      A federal habeas petitioner must provide the state courts with a fair

13  opportunity to correct alleged violations of federal rights.  *Duncan v. Henry*, 513 U.S.

14  364, 365 (1995) (citing *Picard v. Connor*, 404 U.S. 270, 275 (1971)).  This rule

15  requires a petition to raise his federal claims "on every level of direct review," i.e.,

16  "at all appellate stages afforded under state law as of right by that procedure,"

17  including the "intermediate state appellate court."  *Casey v. Moore*, 386 F.3d 896,

18  916–17 (9th Cir. 2004). Pearce failed to properly exhaust his IAC claims by failing to

19  raise them before the Court of Appeals in a procedurally proper context.  Under

20  Arizona's rules, he cannot now seek state court review because he is time barred

21  from filing any further collateral challenge to this conviction.  *See* Ariz.R.Crim.P.

22  32.1(d)-(h), 32.2(a) (precluding claims not raised on direct appeal or in prior post-

1   conviction relief petitions), 32.4(a) (time bar), 32.9(c) (petition for review must be

2   filed within thirty days of trial court's decision).  Thus, other than the three claims he

3   did raise before the Arizona Court of Appeals – that his counsel failed to call Perrin

4   and Anchondo as witnesses to prove misidentification, misstated that Pearce could be

5   impeached with his juvenile adjudications if he testified at trial, and failed to notify

6   Pearce of a plea offer-- Pearce's claims are procedurally defaulted and are not subject

7   to review absent a showing of cause and actual prejudice, a fundamental miscarriage

8   of justice, or actual innocence.

9                   **i.        Cause and Prejudice**

10          As mentioned above, to establish cause, Pearce must point to some objective

11  factor external to the defense impeded his efforts to comply with the state's

12  procedural rules.  *Dretke*, 541 U.S. at 393-94.  "[C]ause is an external impediment

13  such as government interference or reasonable unavailability of a claims factual

14  basis."  *Robinson*, 360 F.3d at 1052.  Pearce contends cause exists here due to the

15  conditions of his confinement and his inability to obtain his file.  *Traverse*, pp. 28-30.

16  What Pearce's argument glaringly ignores is that the claims were raised before the

17  trial court and all he needed to do to present them on appeal was to copy them into

18  his petition for review.  That he was capable of doing so is also illustrated by the fact

19  that, even though he was still representing himself, he did raise the claims in his

20  petition to the Arizona Supreme Court.  Because Pearce was fully aware of the

21  factual and legal basis for these claims, he cannot establish "cause" for the default.

22  *Murray v. Carrier*, 477 U.S. 478, 488 (1986) (citations omitted).   Petitioner's

1    inability to demonstrate the requisite "cause" for his procedural default obviates the

2    need for the Court to even reach the issue of whether Pearce has demonstrated the

3    requisite "prejudice." *See Thomas v. Lewis*, 945 F.2d 1119, 1123 n. 10 (9ᵗʰ Cir.

4    1991).

5                    **ii.      Fundamental Miscarriage of Justice**

6            Because Pearce cannot establish cause for his default, his claims are subject to

7    review only upon a showing that a fundamental miscarriage of justice will result

8    unless the claims are reviewed on their merits. *Schlup v. Delo*, 513 U.S. 298, 315

9    (1995).  To establish such a claim, Pearce must come forward with "new reliable

10   evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness

11   accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513

12   U.S. at 324. Pearce bears the burden of demonstrating that "in light of all the

13   evidence, including evidence not introduced at trial, it is more likely than not that no

14   reasonable juror would have found [him] guilty beyond a reasonable doubt." *Id*. at

15   327; *see also House v. Bell*, 547 U.S. 518, 539 (2006).  "When confronted with a

16   challenge based on trial evidence, courts presume the jury resolved evidentiary

17   disputes reasonably so long as sufficient evidence supports the verdict." *Id*.  A

18   persuasive claim of actual innocence must be based on new evidence that was not

19   presented to the jury that is so compelling that the reviewing court must conclude that

20   it is now probable that no rational juror would vote to convict the defendant. *See id*.

21   at 538–39.  Here, Pearce identifies two categories of evidence in support of his

22   innocence claim.  The first involves the color of his car on January 17, 2000, the date

21

1 on which the shooting occurred.  The second involves Pearce's assertion that he was

2 misidentified as the shooter.   As discussed below, these arguments, whether

3 considered separately or together, do not satisfy the requirements of *Schlup*.

4          As to the first issue, the color of the car, two witnesses at the scene of the

5 shooting, James Ek and Larry Dozier, testified that the Monte Carlo they saw leaving

6 the area of the park after the shooting was white or primer gray in color. *Answer*, Ex.

7 EE, p. 57; Ex. JJ, p. 11.  Pearce's step-mother, Dana Pearce, testified that the car was

8 primer gray in color around Christmas 1999 and that Pearce told her he planned to

9 have it painted.  *Id*., Ex. FF, p. 29.   Another witness, Daniel McCurdy, testified that

10 on January 18, 2000, Pearce contacted him and asked if he knew someone who could

11 paint his car in one day.  *Id.*, Ex. GG, p. 38.

12          Inconsistent with the testimony of Mr. Ek and Mr. McCurdy, Pearce contends

13 that his Monte Carlo was blue in color on January 17, 2000, the date of the shootings.

14 In support of this contention, Pearce has offered the affidavit of his friend, Chris

15 Tinsley, who states that he and Pearce drove Pearce's Monte Carlo to Las Vegas,

16 Nevada, on December 31, 1999, and at the time it was dark blue in color. *Affidavit of*

17 *Chris Tinsely*, attached to *Answer*, Ex. K.  Another friend, Daniel Fanulero, told a

18 defense investigator that he and Pearce were involved in an accident in Pearce's

19 Monte Carlo on January 27, 2000, and at the time of the accident, the car was blue in

20 color and had been for the four months Fanulero had known Pearce.  *Traverse*, Ex.

21 22, p. 1.

22

1    Although it would have been helpful to the defense to call Tinsley and
2    Fanulero to testify at trial, their testimony is not the sort that would prevent a rational
3    juror from finding Pearce guilty.  With their testimony, the issue of the color of
4    Pearce's car would have been more in dispute, but still far from certain.  Tinsley and
5    Fanulero's testimony would still have been contradicted by the testimony of Dana
6    Pearce and Daniel McCurdy.  Additionally, Tinsley and Fanulero testimony would
7    have been subjected to impeachment based on their potential bias based on their
8    friendship with Pearce.

9    Moreover, as the Respondents contend, any testimony related to the color and
10   presence of Pearce's car at the scene of the shooting was rendered irrelevant by
11   Pearce's latest admission that he was at the scene and watched as his cousin, Jonny
12   Vadovich, shoot Duran and Vega.  *Supplemental Petition*, Ex. 19, p. 3.  In light of
13   this admission, Pearce's contention that Tinsley and Fanulero's testimony would
14   have established he was not at the scene makes no sense.  Thus, any additional
15   evidence about the color of Pearce's car on the day of the shooting would not prevent
16   a reasonable juror from convicting Pearce.

17   As for Pearce's misidentification argument, it is also unconvincing.  In
18   support of this claim, Pearce offers his own affidavit in which he states he was with
19   Vadovich at the scene the crime and witnessed his cousin shoot Vega and Duran.
20   *Id*.  He further attempts to support Vadovich's role as the shooter with a report of an
21   interview with Amanda Thomas and an affidavit from Jacob Greenrock.  *Id*., Exs. 15
22   and 16.  Both Thomas and Greenrock are Pearce's friends.  In the interview report,

23

1    Thomas states that she overheard Vadovich bragging to a group of his friends that he

2    had shot Vega and Duran.  *Id*., Ex. 15, p. 2.  In his affidavit, Greenrock states that in

3    May 2000, he saw Vadovich at a Circle K in Phoenix and when he asked Vadovich

4    about Pearce, Vadovich admitted that he shot Vega and Duran and stated that Pearce

5    should not be in jail.  *Id.*, Ex. 16, pp. 1-2.  Greenrock also states that "[a] month or

6    two later," he saw Vadovich at a party in Phoenix and overheard him bragging to

7    friends about the shooting, stating that he was with his cousin, presumably Pearce,

8    and that he had not told his cousin that he was going to shoot the victims.  *Id*., p. 2.

9         In addition to his own statement and those from Thomas and Greenrock,

10   Pearce offers a report prepared by Felice Bedford, Ph.D., an Associate Professor in

11   the Psychology Department at the University of Arizona.  *Id*., Ex. 17.  Dr. Bedford

12   opines that eye witnesses frequently misidentify individuals despite being confident

13   about the accuracy of the identification.  *Id*., p. 8.  She also describes the difficulty

14   associated with cross-racial identification, the effects of hair and external features on

15   identification, and mistaken identity based on faulty line-ups, reconstructed

16   memories, and non-optimal viewing conditions.  *Id*., pp. 1-7.

17        For a number of reasons, this evidence does not establish that it is more likely

18   than not that no reasonable juror would have found Pearce guilty.  *House*, 547 U.S. at

19   536-37.  Turning first to Pearce's affidavit, he alleges that he was with Vadovich in

20   the park when the shooting occurred, and states:

21            Out of nowhere Jonny [Vadovich] pulls a gun and begins
              shooting Vega.  As soon as the shots began Duran ran into the park and
22            I began to jog away from the table and into the street.  There was a

pause in shots fired then a number more.  The shooting went for a total of about 5-10 seconds.  The instant of shock confused me and I just wanted to get away and I didn't know what was happening, or what to do.

*Supplemental Memorandum*, Ex. 19, p. 3.  As a threshold matter, the Supreme Court recently held that when faced with an actual innocence gateway claim, a court should consider the petitioner's unjustifiable delay "as a factor in determining whether actual innocence has been reliably shown."  *McQuiggin v. Perkins*, 133 S.Ct. 1924, 1928 (2013).  Pearce's affidavit is dated October 31, 2012, almost 12 years after the crime, and for the first time he admits that he was at the scene of the crime.  His excuse for the delay is that Vadovich threatened to hurt Pearce's sister if Pearce said anything about the crime.  *Supplemental Memorandum*, Ex. 19, p. 4.  He also claims that based on the "numerous avenues to prove my innocence," he did not believe it necessary to tell his lawyer about Vadovich's role in the shooting.  *Id.*, pp. 4-5.  Given the seriousness of the crimes and the potential penalties he faced, Pearce's explanation for his delay is less than convincing and it appears that the affidavit is merely his latest attempt to avoid responsibility for the crimes.[2]  *Cf. Larsen v. Soto*, -- F.3d --, 2013 WL 6084250, at *10 (9th Cir. 2013) (finding delay justified by petitioner's and independent witnesses consistent description of events and insistence of petitioner's innocence).

---

[2] This is further illustrated by Pearce's previous representation to the state court's that, if he had testified, he would have "told the jury myself [that] I was not involved the night of January 17, 2000 . . . ."  *Answer*, Ex. NN, p. 11.

1    The statements of Thomas and Greenrock are equally uncompelling.

2 Addressing these statements in its denial of PCR relief, the trial court stated:

3    The defendant's "newly discovered evidence" consists of the
     testimony of two friends of his, both convicted felons, and both

4    currently serving prison sentences.  One witness is serving a prison
     sentence for armed robbery, the other for manslaughter.  The proffered

5    testimony is that each of these witnesses heard another person confess
     to the murder that the defendant was convicted of committing.

6

7 *Id.*, Ex. G.  As the trial court suggests, the reliability of the witnesses offered by

8 Pearce is undermined by their friendship with Pearce and their own criminal

9 histories.  These considerations take them far outside the realm of witnesses found to

10 be reliable.  For example, in *Larsen*, -- F.3d --, 2013 WL 6084250, Larsen claimed,

11 as Pearce does here, that the State "had the wrong man."  *Id.* at *13.  In finding

12 Larsen's *Schlup* argument meritorious, the court noted that the eyewitnesses upon

13 whom Larsen relied included an "Army Sergeant First Class and former police chief"

14 and his wife whose version of events exculpated Larsen and was corroborated with

15 other testimony.  *Id.*  Here, the witnesses offered by Pearce would be subject to

16 effective impeachment based on both their friendship with Pearce and their criminal

17 records.  Additionally, unlike the witnesses in *Larsen*, Thomas and Greenrock were

18 not eyewitnesses to the crime and offer nothing in the way of eye witness testimony

19 that would corroborate Pearce's claims of innocence.  *See Schlup*, 513 U.S. at 331

20 (Schlup's evidence included the sworn statements of several eyewitnesses that

21 Schlup was not involved in the crime and was corroborated by testimony that Schlup

22 was elsewhere at the time the crime was committed).

26

1    Returning to Dr. Bedford's opinion, while interesting, it does not undermine

2    the Court's confidence in Pearce's conviction.    Pearce relies on Dr. Bedford's

3    opinions in an attempt to undermine Duran's identification of him as the shooter.

4    Specifically, Dr. Bedford states that Duran's confidence in his identification of

5    Pearce is misleading and unreliable.   *Supplemental Memorandum*, Ex. 17, pp. 1-2.

6    She also raises concerns that Duran, who is Hispanic, without specific training would

7    think that all Caucasians, such as Pearce and Vadovich, "look alike."   *Id.*, p. 2.   Dr.

8    Bedford further questions the accuracy of Duran's identification of Pearce based on

9    the effects of hair and external features on identification, mistaken identity based on

10   faulty line-ups, reconstructed memories, and non-optimal viewing conditions.   *Id.*,

11   pp. 1-7.

12   As a threshold matter, Dr. Bedford's opinions are not the sort of "dramatic

13   new evidence" that would support Pearce's claims of innocence.   *Larsen*, 2013 WL

14   6084250, at *11.   Nor do they constitute objective evidence that would independently

15   cause the Court question his guilt.   *See House*, 547 U.S. at 540-41 (DNA evidence

16   established semen found on murder victim was not from petitioner).   Moreover, her

17   opinions are undermined, and any uncertainty about the verdict arising from the

18   statements provided by Pearce, Thomas, Greenrock, Tinsley and Fanulero is

19   dispelled, by Duran's testimony, which, contrary to Pearce's assertions, was quite

20   certain and specific.

21   At trial, Duran testified that he and Christopher Vega drove to the Conocido

22   Park in a car driven by a man introduced to him as "Eric."   *Answer*, Ex. DD, pp. 134,

27

137. He described Eric as having dark brown or black hair, with facial hair encircling his mouth and hair along his jawline leading to a goatee. *Id*., p. 135. Duran recalled that Eric was wearing high socks, pulled up almost to his knees, long baggy shorts, a dark colored T-shirt and was wearing a black baseball hat. *Id*., pp. 135, 140-41, 168. He noticed that Eric was a little taller than he is and estimated his height at 5'8" or 5'9." *Id*., p. 141. When asked whether Eric was in the courtroom, Duran indicated that he was and identified Pearce. *Id.*, pp. 146-47.

Duran was also questioned about his identification of Pearce during a pre-trial photo line-up. *Id*., p. 154. He recalled Detective Ernest Moreno met with him during his rehabilitation from his wounds and presented him with black and white photos of several individuals. *Id*., p. 155. Upon seeing the photos, he saw that there "was one picture that matched pretty perfectly" to the person who shot him. *Id*., p. 156. That person became known to him later as Pearce. *Id*.

Pearce attempts to characterize Duran's pre-trial identification testimony as suspect because Duran was not absolutely certain that the individual in the photo was the shooter. However, when Duran was asked to explain any uncertainty in his identification of Pearce, he noted that at the time of the shooting, Pearce was wearing a hat and had hair along his jawline. *Id*. He also noted that the photographs showed only Pearce's head and shoulders, "and the whole body could have – the body could have been different than what I have seen, so I didn't want to make a perfect 10 because this could be like someone like six foot tall . . . ." *Id.* He then stated his reservations about his identification of Pearce as the shooter were resolved upon

1   seeing him in court and that there was "no doubt in my mind" that Pearce was the

2   shooter. *Id.*, p. 157.

3       Pearce also seizes on Duran's inability to identify him immediately after the

4   shooting occurred. While he lay bleeding on the ground at the park, an officer asked

5   Duran, "Who shot you?" To which Duran responded that he did not know. *Id.*, p.

6   175. Duran explained that he said he did not know, not because he could not identify

7   the shooter, but because he did not know him. *Id.*, pp. 175, 186.

8        Considering the evidence offered by Pearce in light of Duran's testimony,

9   there is no doubt that a rational juror could nevertheless find Pearce guilty beyond a

10   reasonable doubt. Duran explained that any uncertainty he harbored about Pearce's

11   identity was related to information that was not reflected in the photo line-up. The

12   examples he noted were the lack of a baseball cap and facial hair, along with the fact

13   that the photos did not reveal how tall each of the individuals was. Rather than

14   suggesting uncertainty, such reservations indicate that Duran was being cautious

15   about potentially misidentifying the shooter. It is also clear from Duran's testimony

16   that any reservations he had were dispelled upon seeing Pearce in person.

17       Duran's careful and specific testimony also undermines any doubt potentially

18   raised by Pearce's contention that Vadovich was the shooter, and Dr. Bedford's

19   misidentification theories. Duran testified that the shooter was 5'8" or 5'9" in height

20   and the passenger was approximately 5'10" or 5'11" in height. *Id.*, pp. 141, 158.

21   He knew this because the shooter was a little taller than he and the passenger was a

22   couple of inches taller. *Id.* The Department of Corrections website reflects that

1    Pearce is 5'8" tall and weighs 150 pounds.  *Arizona Department of Corrections*,

2    ADC        Inmate        Datasearch,        www.azcorrections.gov/inmate_datasearch/

3    Index_Minh.aspx (last visited Dec. 10, 2013).  The same website reflects that Jonny

4    Vadovich is 6'5" tall and weighs 210 pounds.  *Id*.  Given Duran's careful and certain

5    testimony about the height of the shooter, it is extremely unlikely that he was nine

6    inches off in his estimate of the shooter's height.  In fact, Duran was so certain of the

7    shooter's height that he testified he could not be certain the photo he chose was the

8    shooter because the individual could "be like someone like six foot tall . . . ."  *Id.*, p.

9    156.

10        The evidentiary value of Dr. Bedford's opinions is also nullified by Duran's

11   testimony.  Dr. Bedford addresses the impact of a number of factors, including race

12   external features, reconstructed memories, and non-optimal viewing conditions, on

13   the accuracy of identifying individuals.  However, nowhere in her report does she

14   address the effect of height disparity or whether identification witnesses frequently

15   confuse individuals with a height disparity of nine inches.  This disparity, despite

16   being expressly raised by Respondents, also goes unaddressed by Pearce in his 57-

17   page, single-spaced Response in Support of Supplemental Petition (Doc. 114).

18        In sum, the evidence offered by Pearce in his effort to overcome the

19   procedural default and to prove his actual innocence does not meet the demanding

20   standard of *Schlup* and is insufficient to overcome the convincing proof of Pearce's

21   guilt.  *See Perkins*, 133 S.Ct. at 1936.

22

1                  **b.**       **Exhausted IAC Claims**

2       Pearce's exhausted IAC claims are that his counsel failed to investigate and

3 present witnesses for the defense (Grounds II, IV and VIII), failed to properly advise

4 Pearce about the State's plea offer (Grounds III and VIII), and failed to properly

5 advise Pearce regarding his right to testify on his own behalf (Ground V). The

6 operative legal standard applicable to these claims is a familiar one, addressed by the

7 United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). The

8 standards enunciated there by the Court are applied unless there is other Supreme

9 Court precedent directly on point. *See Wright v. Van Patten*, 128 S.Ct. 743, 746

10 (2008).

11       Under *Strickland*, Pearce must show both deficient performance and prejudice

12 in order to establish that counsel's representation was ineffective. *Strickland*, 466

13 U.S. at 687. Deficient performance is established by a petitioner's showing that

14 counsel's performance fell below an objective standard of reasonableness. *Hill*, 474

15 U.S. at 57 (citing *Strickland*, 466 U.S. at 688). To establish prejudice, the petitioner

16 must show that there is a reasonable probability that, but for counsel's unprofessional

17 errors, the result of the proceeding would have been different. *Cooper*, 132 S.Ct. at

18 1384 (citing *Strickland*, 466 U.S. at 694).

19       Federal habeas rules also instruct that, if the state court has already rejected a

20 claim of ineffective assistance of counsel, a federal habeas court may grant relief

21 only if it finds the state court's decision was contrary to, or an unreasonable

22 application of the *Strickland* standards. *See Yarborough v. Gentry*, 540 U.S. 1, 5

1  (2003).  The review of counsel's performance must be "highly deferential" and must

2  adopt counsel's perspective at the time of the challenged decision or conduct, in

3  order to avoid the distorting effects of hindsight.  *Strickland*, 466 U.S. at 689.  There

4  is a strong presumption that counsel's conduct falls within the wide range of

5  reasonable assistance, *id.,* and the Supreme Court had described federal review of a

6  state court's decision on a claim of ineffective assistance of counsel as "doubly

7  deferential."  *Cullen v. Pinholster*, 131 S.Ct. 1388, 1403 (2011) (quoting *Knowles v.*

8  *Mirzayance*, 556 U.S. 111, 112-113 (2009)).

9                        **i.      Investigation and Presentation of Witnesses**

10              In Ground II of the Amended Petition, Pearce contends that he urged trial

11  counsel "to bring as many reliable witnesses as possible to support a defense," but

12  that counsel believed the case would be dropped and often told Pearce "we don't

13  need any witnesses."  *Amended Petition*, p. 6.  In Ground IV, Pearce makes a similar

14  assertion, claiming that there were available beneficial witnesses that counsel did not

15  call to testify.  *Id*., p. 6.  To succeed on these claims, Pearce must identify the

16  witness, provide the testimony the witness would have given, show the witness was

17  likely to have been available to testify and would have given the proffered favorable

18  testimony, and demonstrate a reasonable probability that, had such testimony been

19  introduced, the jury would have reached a verdict more favorable to the petitioner.

20  *See Alcala v. Woodford*, 334 F.3d 862, 872–73 (9th Cir.2003).  Pearce has not

21  satisfied these requirements.

22

1    Other than claiming that counsel should have called an expert witness on

2    identification, which is a claim he failed to exhaust, Pearce does not identify the

3    potential witnesses in the Amended Petition.  However, in the only exhausted IAC

4    claim involving witnesses, Pearce identified the two witnesses as Michael Steven

5    Perrin and Steven Daniel Anchondo, Jr.  *Answer*, Ex. N, p. 6; Ex. K, p. 21.  Pearce

6    contends that testimony from Perrin and Anchondo would have helped establish that

7    he was not involved in the crime.  As Pearce explained in his first PCR petition,

8    Perrin and Anchondo failed to identify Pearce in a photo line-up even though Perrin

9    previously met an "Eric" who had the same physical characteristics as Pearce and

10   also drove the same car and was armed with the same type of 9mm pistol that was

11   used in the crime.  *Id.*, Ex. K, p. 21.  Similarly, Anchondo also met a young man

12   named "Eric," who had physical features similar to Pearce's, and who told Anchondo

13   that he would like to "find some subjects who 'ripped him off' and kill them."  *Id.*,

14   Ex. K, pp. 21-23.

15       Given that Pearce now admits to being at the scene when the shooting

16   occurred and now says he would have testified that his cousin was the shooter, it

17   would have been absolutely disastrous for his counsel to call Perrin an Anchondo to

18   testify.  Although they may have been unable to identify Pearce in the photo line-up,

19   Perrin and Anchondo would have described meeting a man named "Eric," who

20   looked like Pearce, drove the same type of car driven by Pearce, carried a 9mm

21   handgun like the one used in the shooting of Vega and Duran, and who was looking

22   for some people who had "ripped him off," so he could kill them.  Coupled with

Pearce's admission that he was present at the shooting, *Supplemental Petition*, Ex. Ex. 19, p. 3, this testimony would have supported the prosecution's claim that Pearce was the shooter by providing identification evidence, physical evidence of the handgun, and a motive.  As such, Pearce's counsel's decision not to call Perrin and Anchondo was sound trial strategy and Pearce was not prejudiced by the decision. *Strickland*, 466 U.S. at 688-89.  The state courts rejection of this claim was a reasonable application of *Strickland*.

### ii.      Failure to Advise of Plea Offer

In Ground III, Pearce claims his counsel was ineffective because he:

> failed to notify petitioner of the available option to plea.  The state made mention of this option in open court on their plea deadline date. Prior to this comment in court petitioner was not aware of any offers or option to plea.  Had counsel made petitioner aware of the actual risks of trial and the potential available sentence – neither of which counsel explained – a plea would have been negotiated.  Instead, petitioner was kept unaware of both the risks and available options and could not possibly have weighed those alone when given but mere seconds in open court to meet the state's deadline, a deadline petitioner never knew of prior to.

*Amended Petition*, p. 7.

In its Minute Entry Order denying this claim, which is the last and only reasoned decision addressing the claim, the trial court stated:

> Even if (as Defendant now alleges) the attorney did not notify Defendant earlier on in the proceeding of a second degree murder plea agreement offer, Defendant has not stated that he would have taken such a plea.  The record shows that Defendant was silent when the prosecutor referred to the plea agreement offer on the record and characterized Defendant as having no interest in the offer.

34

1   *Answer*, Ex. M, p. 1.  The reference to the plea noted by the trial court occurred at the

2   conclusion of a pretrial hearing on October 20, 2000.  During that hearing, in the

3   presence of Pearce, the following exchange took place:

> **Prosecutor:**  Judge, the only other issue, I know we have a trial date
> and today was just for Dessureault hearing, but I also advised Mr.
> Cleary that the plea discussion deadline would be today as well.
>
> I asked him if – and as I have advised the family, we were
> waiting for any input from Mr. Cleary whether to have any plea
> discussions in this case.  I have been advised by Mr. Cleary the
> defendant is not interested in any plea discussion.  And I just wanted to
> put that on the record.  And this was the deadline today.
>
> **The Court:**  All right.
>
> **Defense Counsel:**  I do have another question.  Judge, the trial date is
> December 4.  It appears that I will be free to start this trial December
> 4th, though I have been ordered to do another trial . . . .

12  *Answer*, Ex. CC, pp. 27-28.

13      "[A]s a general rule, defense counsel has the duty to communicate formal

14  [plea] offers from the prosecution ...," *Missouri v. Frye*, ⸺ U.S. ⸺, 132 S.Ct.

15  1399, 1406 (2012), and failure to do so constitutes unreasonable conduct that meets

16  the first prong of the Strickland test.  *United States v. Blaylock*, 20 F.3d 1458, 1466

17  (9th Cir.1994).  The record before the state court, as set forth above, is clear that

18  although counsel may have engaged in plea discussions, there is no indication that

19  the state ever extended a formal plea offer.  The prosecutor refers only to a "plea

20  discussion deadline."  Without showing that a formal offer existed, Pearce's claim

21  that counsel failed to inform him of the plea offer is merely conclusory.

22

35

1   As the trial court notes, the record also reflects that Pearce was made aware of

2   the potential for reaching a plea and remained silent when the prosecutor represented

3   that he had been informed by Mr. Cleary that Pearce was not interested in any plea

4   discussion.   Based on those representations, the trial court made the factual

5   determination that Pearce was aware of the potential for reaching a plea agreement.

6   The AEDPA provides for federal habeas relief where the state court's analysis

7   "resulted in a decision that was based on an unreasonable determination of the facts

8   in light of the evidence presented in the State court proceedings." 28 U.S.C. §

9   2254(d)(2).  For a state court's factual determinations to violate § 2254(d)(2), they

10  must be objectively unreasonable.  In light of the record before the trial court, it

11  would have been unreasonable to determine that Pearce *had not* been informed of the

12  plea negotiations.  Both Pearce and his counsel allowed the prosecutor to represent

13  that Pearce was not interested in plea negotiations.  *Answer*, Ex. CC, pp. 27-28.  The

14  prosecutor additionally emphasized the significance of the representations by stating

15  that he "just wanted to put that on the record. And this was the deadline today." *Id.*,

16  Ex. CC, p. 28.  On this record, the trial court reasonably determined that Pearce was

17  aware of the plea negotiations and was not interested in a plea.  Therefore, he can

18  show neither deficient performance nor prejudice under *Strickland*.

19          **iii.      Failure to Properly Advise of Right to Testify**

20          In Ground V of the Amended Petition, Pearce claims that he asserted his

21  desire to testify on his own behalf at trial, but that he was informed by counsel that

22  "he could not testify due to his juvenile record, which is a misstatement of the law."

36

Pearce wanted to testify "to give the jury a chance to view his demeanor and listen to his facts."

In Pearce's first PCR proceeding, the trial court, in the last and only decision addressing the merits of the claim, concluded as follows:

> Defendant does not provide any facts to show that Defendant's testimony would have changed the result in this case. Defendant asserts that his lawyer misadvised him about impeachment by juvenile adjudications. The Court cannot conclude that Defendant's testimony (unspecified) would have affected the jury verdict in a case such as this matter where the evidence of guilt was strong.

*Answer*, Ex. M, p. 1.

The Supreme Court has held that the right to be heard includes the right to testify on one's own behalf. *Rock v. Arkansas*, 483 U.S. 44, 49 (1987) ("It cannot be doubted that a defendant in a criminal case has the right to take the witness stand and testify in his or her own defense."). The right to testify in one's own defense is personal; it may only be relinquished by the defendant, and such a waiver must be knowing and intentional. *United States v. Joelson*, 7 F.3d 174, 177 (9th Cir.1993). However, the *Strickland* standard must be satisfied to support a claim that counsel was ineffective by denying a petitioner his constitutional right to testify. *Medley v. Runnels*, 506 F.3d 857, 861 (9th Cir. 2007).

Here, the trial court correctly determined that Pearce had not shown that his inability to testify was prejudicial. Although Pearce raised this claim in his first PCR petition, he did not identify any of the testimony he would have offered if given the chance. Nor did he explain how what he might offer would have changed the

1    outcome of his trial. *See Answer*, Ex. K, pp. 25-26. Thus, the trial court's finding

2    that Pearce had not established that his testimony would have affected the outcome of

3    the trial, was fully supported by the record. As such, Pearce did not show prejudice

4    under *Strickland* and is not entitled to relief on this claim.

5          Things do not improve for Pearce even if a search is undertaken of subsequent

6    pleadings in an effort to determine what facts he wanted the jury to hear. In his

7    petition submitted to the Arizona Supreme Court in his first PCR proceeding, Pearce

8    for the first time expounded on what his testimony might have been. He explained

9    that he would have informed the jury of the true nature of his relationship with

10    McCurdy, who had testified at trial that on the day after the shootings, Pearce asked

11    him if he knew somebody who could paint his car in one day. *Id.*, Ex. Q, pp. 11-12.

12    Pearce also says he would have testified that his car was painted blue by New Year's

13    Day 2000, "making it impossible for defendant to have committed this crime as

14    witnesses reported a gray or white primer car." *Id.*, Ex. Q, p. 12. As Pearce now

15    admits, he was at the scene of the shooting. *Supplemental Memorandum*, Ex. 19, p.

16    3. Thus, any testimony about the color of his car or that it was present at the scene,

17    evidence of which was used to establish he was at the scene, is entirely irrelevant.

18          Based on these considerations, the trial judge reasonably found that any error

19    by trial counsel in advising Pearce about his right to testify did not prejudice Pearce.

20    His conclusion was not contrary to or an unreasonable application of *Strickland* and

21    Pearce is not entitled to habeas corpus relief on this claim.

22

1              **3.      Ground IX**

2       In Ground IX of the Amended Petition, Pearce claims that the trial court

3    abused its discretion and violated his due process rights when it denied his request

4    that the jury be instructed pursuant to *State v. Willits*, 96 Ariz. 184, 393 P.2d 274

5    (1964), to infer that missing evidence would have been exculpatory.   *Amended*

6    *Petition,* p. 13.   As Pearce explains, the missing evidence is the interview notes

7    memorializing Duran's description of the shooter given to Detective Moreno, which

8    Moreno failed to incorporate into his police report.

9       Respondents correctly contend that this claim was not exhausted.  In his direct

10   appeal, Pearce did not present this issue as one of federal law.  In his opening brief

11   on appeal, he cited five cases in support of his argument the he was entitled to a

12   *Willits* instruction.  All five were Arizona state court decisions.  Nevertheless, in his

13   Traverse in this case, Pearce argues that *State v. Serna*, 163 Ariz. 260, 787 P.2d 1056

14   (1990), a case he never cited in his state court pleadings, supports the notion that the

15   *Willits* argument is "draped . . . with the cloak of a federal question." *Traverse*, p. 63.

16   The Ninth Circuit has made it clear that a state claim's attenuated relationship with a

17   federal due process claim does not satisfy the exhaustion requirements.

18      The Ninth Circuit has held that a "general appeal to a constitutional guarantee,

19   such as due process, is insufficient to satisfy fair presentation requirements.

20   *Shumway v. Payne*, 223 F.3d 982, 987 (9th Cir.2000) (quoting *Gray v. Netherland*,

21   518 U.S. 152, 163 (1996).   "Exhaustion demands more than drive-by citation,

22   detached from any articulation of an underlying federal legal theory." *Castillo v.*

1    *McFadden* 399 F.3d 993, 1003 (9th Cir.2005).  Moreover, "mere similarity between a

2    claim of state and federal error is insufficient to establish exhaustion."  *Shumway*,

3    223 F.3d at 988 (quotations omitted).  Under these standards, Ground IX was not

4    exhausted on direct appeal.  Pearce never identified a federal basis for the claim, and

5    did not explain or apply any state law that even hinted that a federal basis might

6    exist.  In fact, even if he had used the words "due process" in his argument before the

7    state courts, "[i]t is not enough to make a general appeal to a constitutional guarantee

8    as broad as due process to present the 'substance of such a claim to a state court."

9    *Shumway*, 223 F.3d at 987.  Thus, Pearce's Willits claim on direct appeal was

10    insufficient to establish fair presentment.

11        Pearce alternatively contends that the claim was exhausted in his first PCR

12    proceedings.  In that PCR petition, Pearce offered the same facts that supported his

13    *Willits* claim on direct appeal, but this time claimed that it was prosecutorial

14    misconduct to not provide him with Detective Moreno's notes of Duran's

15    identification of the shooter.  *Answer*, Ex. K, pp. 7-15.  The trial court, citing Rule

16    32.2 of the Arizona Rules of Criminal Procedure, denied the claim as "precluded

17    because it either could have been or was raised on appeal."  *Answer*, Ex. M, p. 1.  *See*

18    Ariz.R.Crim.P. 32.2(a)(1) and (2) ("A defendant shall be precluded from relief under

19    [Rule 32] based upon any ground . . . [r]aisable on direct appeal . . . [or] [f]inally

20    adjudicated on the merits on appeal . . . .").  Thus, the trial court found the claim

21    barred on state procedural grounds. That creates a procedural default so long as "the

22    state procedural rule is a nonfederal ground adequate to support the judgment and the

1   rule is firmly established and consistently followed." *See Martinez v. Ryan*, 132 S.Ct.

2   1309, 1316 (2012); *Coleman*, 501 U.S. 722, 729–30 (1991). Rule 32 is such a

3   ground. *See Stewart*, 536 U.S. at 860–61. Ground IX is procedurally defaulted.

4        The merits of Ground IX need not be addressed unless Pearce establishes

5   cause and prejudice or that a fundamental miscarriage of justice has occurred. In his

6   Traverse, he does not discuss cause and prejudice in direct relation to Ground IX. To

7   excuse his default, Pearce relies on the general discussion of cause and prejudice,

8   which was discussed and rejected above in relation to his defaulted IAC claims. For

9   the reasons cited in that discussion, Pearce has not established cause and prejudice

10  for his default of Ground IX.

11               **4.    Ground X**

12       In Ground X of the Amended Petition, Pearce claims that the trial court gave

13  an unconstitutionally vague jury instruction on premeditation in violation of his right

14  to due process in violation of the Fourteenth Amendment.[3]  *Amended Petition*, p. 14.

15  Pearce specifically alleges that the definition of premeditation, found in A.R.S. § 13-

16  1101(1), rendered the charge of first-degree murder "barely distinguishable from the

---

[3] The instruction in question read:

> Premeditation means that the defendant acts with either the intention or the knowledge that he will kill another human being, when such intention or knowledge precedes the killing by any length of time to permit reflection. Proof of actual reflection is not required, but an act is not done with premeditation if it is the instant effect of a sudden quarrel or heat of passion.

*Answer*, Ex. HH, p. 7.

1  lesser charge of second degree murder." *Id*.   He contends therefore that the

2  instruction violates the constitutional guarantee found in *In re Winship*, 397 U.S. 358

3  (1970), that guilt be found beyond a reasonable doubt as to each and every element of

4  a charged crime.

5      The Supreme Court in *In re Winship* held that "the Due Process Clause

6  protects the accused against conviction except upon proof beyond a reasonable doubt

7  of every fact necessary to constitute the crime with which he is charged.  397 U.S. at

8  364.  A habeas petitioner who argues, as Pearce does here, that a constitutional error

9  resulted from a jury instruction that quotes a state statute has an "especially heavy"

10 burden.  *Waddington v. Sarausad*, 555 U.S. 179, 190 (2009) (*citing Henderson v.*

11 *Kibbe*, 431 U.S. 145, 155 (1977).  An allegedly improper jury instruction will merit

12 habeas relief only if "the instruction by itself so infected the entire trial that the

13 resulting conviction violates due process."  *Estelle v. McGuire*, 502 U.S. 62, 72

14 (1991); *see Jeffries v. Blodgett*, 5 F.3d 1180, 1195 (9th Cir. 1993).  The instruction

15 "'may not be judged in artificial isolation,' but must be considered in the context of

16 the instructions as a whole and the trial record."  *Id.* (*quoting Cupp v. Naughten*, 414

17 U.S. 141 (1973)).  It is not sufficient for a petitioner to show that the instruction is

18 erroneous; instead, he must establish that there is a reasonable likelihood that the jury

19 applied the instruction in a manner that violated a constitutional right.  *Id.*; *Carriger*

20 *v. Lewis*, 971 F.2d 329, 334 (9th Cir. 1992) (en banc).  Pearce cannot make this

21 showing.

22      At the time of Pearce's trial, the statute defined premeditation as meaning:

42

1

2

3

4

> that the defendant acts with either the intention or the knowledge that he will kill another human being, when such intention or knowledge precedes the killing by any length of time to permit reflection. Proof of actual reflection is not required, but an act is not done with premeditation if it is the instant effect of a sudden quarrel or heat of passion.

5

6

7

8

A.R.S. § 13-1101(1) (West 1998). At the conclusion of the trial, the trial court gave a premeditation instruction that followed the statute. *Answer*, Ex. HH, p. 7. As such, Pearce must satisfy the heightened requirements of *Waddlington* to show constitutional error. 555 U.S. at 190.

9

10

11

12

13

14

15

16

With these standards in mind, the Court must examine the decision of the Arizona Court of Appeals, which provided the last and only reasoned decision on the claim. On direct appeal, Pearce claimed that the definition of premeditation contained in the statute and the jury instruction was vague and violated his rights under both the federal constitutional and state law. *Answer*, Ex. D, pp. 21, 24. Specifically, Pearce argued that that the inclusion of the requirement that "proof of actual reflection is not required," a provision which was added to the statute by the legislature in 1998, rendered the statute vague and eliminated any meaningful distinction between first and second-degree murder.

17

18

19

20

21

22

In rejecting Pearce's arguments, the Arizona Court of Appeals did not directly address the federal due process component of the claim, and found that the instruction was not unconstitutionally vague under Arizona law. *Answer*, Ex. G, pp. 4-5. In support of its conclusion, the Arizona Court of Appeals relied on its own then-recent decision in *State v. Thompson*, 201 Ariz. 273, 34 P.3d 382 (App. 2001).

1    In *Thompson*, the Court of Appeals found that a jury instruction, which included

2    A.R.S. § 13-1101(1)'s provision that proof of actual reflection is not required, did not

3    "relieve the state of any obligation to prove actual reflection."   Rather, the court

4    stated, the statute provided that "premeditation consists solely of the passage of the

5    specific period of time."  *Id*. at 278, 34 P.3d at 387.

6         Much of Pearce's argument in the instant petition relies on the fact that the

7    Arizona Supreme Court subsequently vacated the Court of Appeals' decision in

8    *Thompson*.   On March 12, 2003, approximately two months after the Arizona

9    Supreme Court denied Pearce's petition for review, the Arizona Supreme Court filed

10   its decision in *State v. Thompson*, 204 Ariz. 471, 65 P.3d 420 (2003).  In vacating the

11   decision of the Court of Appeals, the Supreme Court disapproved the use of the

12   phrase "proof of actual reflection is not required" in a first-degree murder instruction.

13   The Court was concerned that the phrase could mislead the jury into believing that

14   the state did not have to prove reflection.  *Id*. at 479, 65 P.3d at 428.

15        Pearce seizes on the Arizona Supreme Court decision in *Thompson* and

16   contends that it both established that the Arizona Court of Appeals' decision was

17   incorrect and that the instruction in question was unconstitutional.  However, neither

18   argument helps his cause.  First, as to the decision of the Court of Appeals, Pearce

19   has not shown that the decision was contrary to or an unreasonable application of

20   Supreme Court law or based on an unreasonable determination of the facts.  As stated

21   above, in rejecting Pearce's claim, the Court of Appeals relied on its own decision in

22   *State v. Thompson*, 201 Ariz. 273, 34 P.3d 382 (2001).  As the Court of Appeals

noted, that case was directly on point and dictated the result in Pearce's case. *Answer*, Ex. F, p. 5.  Moreover, in reaching its decision in *Thompson*, the Arizona Court of Appeals analyzed the federal due process implications of the jury instruction and cited relevant federal authorities, 201 Ariz. at 277, 34 P.3d at 386, none of which compelled a finding that the instruction in question violated clearly established federal authority.

But, Pearce contends, the Arizona Supreme Court's subsequent decision vacating the Arizona Court of Appeals decision in *Thompson* shows that the instruction in question was unconstitutional.  It does nothing of the sort.  In reaching its conclusion in *Thompson*, the Arizona Supreme Court twice explained:

> Recognizing that direct proof of a defendant's intent to kill often does not exist, the legislature sought to relieve the state of the often impossible burden of proving premeditation through direct evidence. But by this act the legislature did not intend to eliminate the requirement of reflection altogether or to allow the state to substitute the mere passing of time for the element of premeditation. While the phrase "proof of actual reflection is not required" can be interpreted in a way that relieves the state of the burden of proving reflection, such an interpretation would not pass constitutional scrutiny, and the legislature could not have intended such a result.  Accordingly, we conclude that the legislature intended to relieve the state of the burden of proving a defendant's thought processes by direct evidence. It intended for premeditation, and the reflection that it requires, to mean more than the mere passage of time.

204 Ariz. at 479, 65 P.3d at 428.  The Court also noted support for this conclusion by the inclusion in the instructions of the admonition that "an act is not done with premeditation if it is the instant effect of a sudden quarrel or heat of passion."  *Id*. That admonition was also included in Pearce's case.

1    Given the lack of any clearly established federal authority to the contrary, the

2    Court cannot conclude that the premeditation instruction given in Pearce's case was

3    unconstitutional.  Given this lack of authority, neither the Arizona Court of Appeals

4    nor Supreme Court's decisions in *Thompson*, although not internally consistent, can

5    be said to be an unreasonable application of federal law.  Moreover, neither case

6    found the instruction unconstitutional, and Pearce points to no federal authority that

7    existed at the time that would clearly support the idea that it was.  As such, Pearce

8    has failed to satisfy the standard for habeas relief on this claim.

9        **5.    Ground XI**

10    Pearce raised Ground XI for the first time in his Supplemental Memorandum

11    filed on January 16, 2013 (Doc. 108).  In this claim, Pearce contends that he is

12    entitled to a new trial under *Brecht v. Abrahamson*, 507 U.S. 619 (1993), "in light of

13    the record as a whole."  *Supplemental Memorandum*, p. 1.  His claim is based

14    primarily on the statements from Amanda Thomas and Jacob Greenrock claiming

15    that they individually overheard Jonny Vadovich bragging that he had shot Vega and

16    Duran.  *Answer.*, Ex. 15 (Thomas), Ex. 16 (Greenrock).  He additionally relies on his

17    own statement submitted with the Supplemental Memorandum.  *Id.*, Ex. 19.

18    As a threshold matter, Ground XI is untimely.  The Court permitted Pearce to

19    file a supplemental brief to address the possibility of satisfying the *Schlup* gateway to

20    having his procedurally defaulted IAC claims addressed on the merits.  This was an

21    opportunity to present additional evidence and legal authority in support of existing

22    claims, "not to raise substantively new issues or claims."  *See Cacoperdo v.*

1   *Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994) (new claims should be raised in an

2   amended petition).   Pearce's former counsel sought to file a Second Amended

3   Petition, however, Pearce's request that it be struck was granted and he subsequently

4   filed his Supplemental Petition.   As such, he has not sought to amend the First

5   Amended Petition to add the new claim and new allegations contained in Ground XI.

6   *See generally Mayle v. Felix*, 545 U.S. 644, 662–64 (2005) (holding that amended

7   claims filed after expiration of AEDPA's limitation period must relate back to a claim

8   raised in the original timely filed petition).

9        Ground XI is also procedurally defaulted.   In dismissing Pearce's third PCR

10   petition, the trial court determined the "newly discovered" evidence offered did not

11   satisfy the requirements of Arizona Rules of Criminal Procedure, Rule 32.1(e), and

12   that Pearce had failed to raise a colorable claim for relief under Rule 32.6(c).   As

13   discussed previously, claims not presented to the state courts on either direct appeal

14   or collateral review are generally barred from federal review because any attempt to

15   return to state court to present them would be futile unless the claims fit into a narrow

16   range of exceptions.   *See* Ariz.R.Crim.P. 32.1(d)-(h), 32.2(a) (precluding claims not

17   raised on direct appeal or in prior post-conviction relief petitions), 32.4(a) (time bar),

18   32.9(c) (petition for review must be filed within thirty days of trial court's decision).

19   Because these rules have been found to be consistently and regularly followed, and

20   because they are independent of federal law, their specific application to Pearce's

21   claim by the trial court, and their operation precluding the return to state court to

22   exhaust Ground XI, procedurally bars review by this Court.   *Stewart*, 536 U.S. at

1    860; *Ortiz v. Stewart*, 149 F.3d 923, 931-32 (9th Cir. 1998) (Rule 32, Ariz.R.Crim.P.

2    is strictly followed); *State v. Mata*, 916 P.2d 1035, 1050-52 (Ariz. 1996) (waiver and

3    preclusion rules strictly applied in post-conviction proceedings).

4           As discussed above in section II.C.2.a.i and ii, the newly discovered evidence

5    Pearce offers does not establish cause and prejudice for his default and does not show

6    that a fundamental miscarriage of justice will result unless the claims are reviewed on

7    their merits.  Moreover, as discussed in relation to Pearce's claim of actual innocence

8    in an attempt to satisfy the *Schlup* gateway, and as discussed in relation to the merits

9    of each of his exhausted claims, his claims of error, whether considered separately or

10   cumulatively, did not have a "substantial and injurious effect or influence" on the

11   jury's verdict.  *Brecht*, 507 U.S. at 637.  As such, he is not entitled to habeas relief.

12   **III.   <u>MOTIONS</u>**

13          Pearce filed a Motion to Expand Record with Exhibits (Doc. 112) requesting

14   that the Court allow him to file additional exhibits in support of his procedural

15   default, cause and prejudice and miscarriage of justice arguments.  The motion is

16   granted and the Court considered the supplemental documents as discussed above.

17          Pearce also filed a Motion to Exceed Page Limitations (Doc. 113) in his reply

18   in support of his Supplemental Memorandum.  That motion is also granted and the

19   Court examined the arguments and authorities contained therein.

20   . . . .

21   . . . .

22   . . . .

1

2  **IV.     RECOMMENDATION AND ORDER**

3          Based on the foregoing, the Magistrate Judge **RECOMMENDS** that the

4  District Court, after its independent review, **deny** Pearce's Amended Petition for

5  Writ of Habeas Corpus (Doc. 15).

6          The Court also **grants** Pearce's Motion to Expand Record with Exhibits (Doc.

7  112) and Motion to Exceed Page Limitations (Doc. 113).

8          The Recommendation is not an order that is immediately appealable to the

9  Ninth Circuit Court of Appeals.  Any notice of appeal pursuant to Rule 4(a)(1),

10  Federal Rules of Appellate Procedure, should not be filed until entry of the District

11  Court's judgment.

12          However, the parties shall have fourteen (14) days from the date of service of

13  a copy of this recommendation within which to file specific written objections with

14  the District Court.  *See* 28 U.S.C. § 636(b)(1) and Rules 72(b), 6(a) and 6(e) of the

15  Federal Rules of Civil Procedure.  Thereafter, the parties have fourteen (14) days

16  within which to file a response to the objections.  Replies may be filed only with

17  leave of the District Court.  If any objections are filed, this action should be

18  designated case number: **CV 06-2841-PHX-SMM**.  Failure to timely file objections

19  . . . .

20  . . . .

21  . . . .

22

1  to any factual or legal determination of the Magistrate Judge may be considered a

2  waiver of a party's right to *de novo* consideration of the issues.  *See United States v.*

3  *Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir.2003) (*en banc*).

4          Dated this 3rd day of January, 2014.

_____
Jacqueline M. Rateau
United States Magistrate Judge